**GASOLINE PRODUCTS CO., Inc., v. CHAMPLIN REFINING CO.**

No. 1336.

Circuit Court of Appeals, Tenth Circuit.

Nov. 18, 1936.

Ramsay Hoguet and Drury W. Cooper, both of New York City (Brady Cole, of Houston, Tex., John B. Marsh, of New York City, and E. R. Wright, of Santa Fe, N. M., on the brief), for appellant.

J. Bernhard Thiess and Thorley von Holst, both of Chicago, Ill. (Arthur C. Denison, of Cleveland, Ohio, Earle W. Evans, of Wichita, Kan., Nathan Scarritt, of Enid, Okl., and Carl H. Gilbert, of Santa Fe, N. M., on the brief), for appellee.

Before PHILLIPS and McDERMOTT, Circuit Judges, and KENNEDY, District Judge.

PHILLIPS, Circuit Judge.

Gasoline Products Company brought this suit against Champlin Refining Company to enjoin the infringement of three patents and for an accounting.

The patents involved are: Rosenbaum, No. 1,324,983, issued December 16, 1919, all the claims of which are in suit; Cross, No. 1,734,079, applied for February 16, 1925, and issued November 5, 1929, claims 4 and 5 of which are in suit; and Howard and Loomis, No. 1,869,337, applied for May 23, 1921, and issued July 26, 1932, claims 7 to 11 inclusive of which are in suit.

From a decree holding the Rosenbaum patent invalid and not infringed, the Cross patent invalid and not infringed and the Howard and Loomis patent not infringed, Products Company has appealed.

In their briefs, counsel for Products Company have abandoned their appeal as to the Rosenbaum patent and further reference will not be made thereto.

The Products Company, a Delaware corporation, is a patent owning and licensing company. The Champlin Company, a New Mexico corporation, is engaged in refining petroleum at Enid, Oklahoma.

The Howard & Loomis patent is for a process for treating heavy crude oil. The Cross patent is for a furnace for heating liquids and gases, including hydrocarbon oils.

Petroleum in its natural state is made up of many combinations of hydrogen and carbon. These various combinations are classified according to relative density or boiling point. Distillation involves the mere physical separation of these various compounds and results in no chemical reaction. Cracking involves the decomposition of these complex hydrocarbon molecules of petroleum and converts them into incondensable gases, gasoline, kerosene, gas oil, fuel oil, lubricating oil, greases, tar and asphalt. This chemical reaction or cracking is produced by the application of intense heat for a sufficient length of time to break up the molecules. Time and temperature are the basic factors in any oil cracking process. Cracking commences at a temperature of about 700 degrees Fahrenheit. With each twenty degrees rise in temperature above the minimum cracking temperature, the speed of cracking approximately doubles. For example, oil will crack about 32 times faster at 900 degrees than it will at 800 degrees. In other words, increasing the temperature factor decreases the time factor.

The process of cracking had been known to the art for many years prior to the respective dates on which the applications for the patents in suit were filed. In 1860, Atwood secured a patent for the cracking of oil. At that time the primary object was to obtain kerosene. Subsequently thereto, considerable cracking for kerosene was carried on in Pennsylvania. The first real contribution to the art of cracking for gasoline was made by Burton in 1912. Since then many improvements have been made and many patents on cracking processes have issued.

Early in the history of the cracking art two methods of cracking were developed. One in which the oil was cracked in the liquid state, which became known as the liquid phase; and the other in which it was cracked in the vapor state, which became known as the vapor phase.

The liquid phase involves the raising of the temperature of the oil while under pressure. By applying pressure the boiling points of the lighter hydrocarbons in the oil are raised above the cracking temperature of 700 degrees and since pressure does not affect the cracking temperature, the oil cracks in the liquid state. Burton applied pressure and cracked the oil in the liquid state. The gasoline produced by cracking in the liquid state was water white and sweet smelling. It resembled the gasoline recovered from the oil by distillation and found favor with the buying public. Gasoline produced from cracking in the vapor state was foul smelling and yellow in color; and it was difficult to refine and did not sell readily. More recently there has developed a variant of the vapor phase process known as the liquid-vapor phase in which the oil is cracked in both phases in the same process. The vapor and liquid-vapor phase processes were used by the Texas Company at Bayonne, New Jersey, as early as 1916. Vapor phase operations were also conducted by Rittman at Oil City, Pennsylvania, as early as 1915. The gasoline produced by the liquid vapor and vapor phase processes is high in anti-knock qualities and with the advent of the high compression automobile it immediately found favor.

In the early days cracking was dangerous and many persons were killed in the commercial operation of the various cracking processes because of explosions and fires. The chief difficulty encountered was the formation of carbon when cracking took place. All processes could crack oil one way or another and could produce the lighter and more volatile hydrocarbons, but the problem was to do it continuously or at least for a sufficient period of time to make the operation a success financially, and to do it in such a way as to avoid dangerous conditions likely to result in destructive fires or explosions. Since carbon formation was a major problem in cracking, there was a constant struggle by those who developed the art to eliminate carbon deposits.

## Champlin Company's Process and Device

The Champlin Company in its refining operations, employs Winkler-Koch cracking stills. Two were installed in 1929 and a third in 1931.

The device and the process employed by Champlin Company are illustrated by the following drawing.

WINKLER KOCH CRACKING UNIT
CHAMPLIN REFINING CO.
ENID, OKLAHOMA

Each still consists of a low pressure and a high pressure furnace, a vapor separator, a bubble tower, a pressure distillate condenser, a gas separator, two coolers, connecting pipe and several pumps.

The device and process are utilized to secure a clean charging stock from a reduced crude by fractional distillation, to crack this clean charging stock and to segregate the products of such cracking by fractionation.

The process employed is as follows:

Reduced crude is pumped by means of a pump labeled "topped crude pump" through a preheating coil in the bubble tower and then to the lowest bank of coils in the low pressure furnace. This preheater coil in the bubble tower serves two purposes. The cold topped crude is heated by the hot vapors rising in the bubble tower and the vapors are cooled causing the fractions with lower boiling points in such vapors to condense and fall back. While passing through this heat exchanger, the temperature of the topped crude is raised to about 500 degrees. After passing through the low pressure furnace it is discharged therefrom at a temperature of 640 degrees into a transfer line which connects the high pressure or cracking heater with the vapor separator. At that point it comes in contact with the stream of products, from the cracking heater, which has a temperature of about 920 degrees. The two streams combine and are discharged into the lower part of the vapor separator at a temperature of 795 degrees.

The pressure in the vapor separator is considerably lower than in the furnaces and the lighter constituents rise to the top of the separator and pass through the vapor line to the bubble tower while the heavier constituents, such as tar and fuel oil, are drawn off at the bottom of the separator, cooled and sent to storage.

After the vapors from the separator enter the bubble tower a further separation takes place. The pressure distillate rises to the top and goes through a pressure distillate condenser and into a gas separator where the incondensable gas is separated from the desired pressure distillate which is drawn off. The condensed gas oil from the reduced crude which has passed through the low pressure furnace and vapor separator and the condensed vapors of the insufficiently cracked material drop to the bottom of the bubble tower where they are drawn off and by means of a pump forced through the high pressure or cracking furnace. The charging stock is also supplemented by gas oil pumped into the bubble tower from an outside source. The insufficiently cracked material constitutes about 58 per cent of the charge that goes to the high pressure furnace.

The cracking furnace has a combustion chamber, a bridge wall, a heating chamber and several banks of tubes through which the oil travels. The fire is in the combustion chamber. The products of combustion from the fire pass over the bridge wall, down through the various banks of tubes, under the furnace and out the chimney. The bank of tubes just under the roof of the furnace is known as the roof bank and is heated by radiant heat. The tubes behind the bridge wall are heated by convection heat or, in other words, by coming in contact with the hot products of combustion passing over the bridge wall, down and out the chimney. These products of combustion are hottest at the top of the bridge wall and become cooler as they pass down through the several tube banks because heat is being absorbed by such banks. The lowest bank is the coolest and is known as the preheater or heat economizer bank.

The clean charging stock or gas oil taken from the bubble tower enters the preheater bank and the temperature is raised from about 580 degrees to 665 degrees. From there it enters a transfer tube and goes to the top or convection bank where the temperature is raised to 740 degrees. From there it goes to the lower row of tubes of the roof bank and passes through them and the upper row of tubes of the roof bank. There the heat is most intense and the temperature is raised to 900 degrees. It then passes to the middle section of the tubes in the convection bank and the temperature is raised to 930 degrees. Although the heat is not as intense here as the heat in the combustion chamber where the roof bank is located, the substance in the tubes continues to absorb heat and the temperature increases slightly. It then leaves the furnace and flows through a pressure release valve, joins with the stream coming from

the low pressure furnace and is discharged into the vapor separator. The cooling of this cracked stream by the stream from the low pressure furnace lessens the cracking in the vapor separator and, in view of the short time it is kept in such separator, no substantial amount of carbon is formed therein.

The time required for the stream to pass through the cracking furnace is six minutes. By so regulating the time factor, deposit of carbon in the tubes is reduced so that the average length of runs of the stills is 51 days. When the stream of material enters the high pressure furnace, it contains one per cent of gasoline. When the stream leaves the roof tubes, fifteen per cent of it by weight is vaporized and the gasoline content is thirteen per cent. When the stream leaves the first six rows of the final bank, seventy per cent of it by weight is vaporized. When the stream has passed through sixty per cent of the final bank, the gasoline content is twenty-one per cent. When the stream leaves the furnace, ninety-five per cent by weight is vaporized and the gasoline content is twenty-three per cent. At the outlet of the roof tubes, nearly fifty per cent of the stream by volume is vapor. As it leaves the first six rows of the final bank nearly ninety per cent by volume is vapor, and when it leaves the furnace, ninety-nine per cent by volume is vapor. As the vapors form, they mix with the liquid and form a fume or foamy mass which travels through the cracking tubes at high velocity. The product of the process has the characteristics of those produced by the liquid vapor process and is high in antiknock qualities, the octane content being 65 to 70. From the foregoing, it will be seen that the charge is cracked while part of it is vapor and part of it is liquid, and the insufficiently cracked material is recycled.

Howard & Loomis Patent

While claims 7 to 11 inclusive are in suit, claims 7, 9 and 10 set out in note 1 sufficiently disclose the claimed inventions.

1 "7. The process of effecting the pyrogenetic conversion of a heavy hydrocarbon oil into lighter hydrocarbon oils which consists in flowing the heavy oil in a restricted stream at high velocity through an initial heating zone in which it is heated rapidly to a cracking temperature above 650 degrees F. and thereupon flowing the initially heated oil without substantial separation of vapors and at substantially the same rate of speed once only through and out of a zone, supplying heat at a slow rate therein sufficient to maintain the said temperature without more than a slight rise in temperature while maintaining a pressure of at least 60 pounds gauge on the oil in both said zones.

"9. The process of effecting the pyrogenetic conversion of a hydrocarbon oil into desired lower boiling products which comprises continuously forcing a stream of said oil at high velocity in succession, first through a restricted passage in a heating zone in which the oil is raised rapidly to a temperature at which cracking takes place at a substantial rate, and thereupon with undiminished velocity in a restricted stream once only through and out of a zone in which it is heated mildly without substantial separation of vapors to maintain its cracking temperature without more than a slight rise in temperature, discharging the heated oil products from the latter zone and maintaining superatmospheric pressure on the oil stream passing through said heating zones, whereby substantial conversion into desired lower boiling products is secured in said latter zone.

"10. In the process of effecting the pyrogenetic conversion of a hydrocarbon oil into desired lower boiling hydrocarbon oils, continuously moving a body of said oil in a stream at high velocity in succession, first through a restricted passage in a heating zone in which the oil is raised rapidly to a temperature at which cracking takes place at a substantial rate and thereupon with undiminished velocity once only through and out of a zone in which it is heated mildly without substantial separation of vapors to maintain its cracking temperature without more than a slight rise in temperature, discharging the heated oil products from the latter zone while maintaining superatmospheric pressure on the oil in said stream passing through said heating zones whereby substantial conversion thereof into desired low boiling products in said latter heating zone is secured, and utilizing the contained heat of the treated oil to effect the preheating of fresh oil passing to said heated zones."

The following is a patent drawing illustrating the Howard & Loomis process.

The process of this patent is described in that portion of the specifications set forth in note 2.

It will be observed that the claims, themselves, are expressly limited to a "once-through" operation and the slow application of heat in the second zone.

In the patent office the Howard & Loomis application was involved in an interference with an application of one Pyzel.

2 "The present invention relates to the art of converting hydrocarbon oils and more particularly to the reduction of the density and viscosity of heavier hydrocarbon oils and to the formation of low boiling point hydrocarbon oils therefrom. * * *

"The pressure maintained upon the oil during its passage through the initial heating and converting coils is at least sufficient to maintain it substantially entirely in the liquid phase during treatment. * * *

"The following example will illustrate the application of the present invention to the conversion of a heavy hydrocarbon oil to reduce its viscosity and to produce lighter hydrocarbons therefrom. A heavy Mexican crude oil * * * is pumped under pressure of 60 pounds gauge or higher through the preheater and the initial heating and converting coils. In the preheater 7 its temperature is raised to a point somewhat below that at which cracking takes place to an appreciable extent, say about 450–500 degrees F., at which temperature the oil enters the initial heating coil 10. A small proportion of superheated steam, for example 7 to 9 per cent. by weight of the oil, is introduced into the oil through pipe 11 as the oil enters the initial heating coil.

"As the oil flows through the initial heating coil 10 the latter is fired hard in order to rapidly raise the temperature of the oil to a temperature at which conversion or cracking proceeds at a substantial rate, which temperature is above 650 degrees F. and is preferably 725 degrees–750 degrees F., this temperature being acquired as the oil approaches the end of the initial heating coil. From the initial heating coil 10 the oil passes at once into the converting coil 15. This coil is fired slowly, the temperature rising only slightly to a higher cracking or conversion temperature of say 800 degrees F. and being maintained there. During its travel through this coil the desired conversion of the oil is effected and local overheating of the coil is minimized. * * * From the converting coil 15 the oil enters the central compartment 17 of preheater 7, passing around the tubes 18 through which the incoming stock is flowing. The converted oil is cooled in the preheater to the desired temperature, say 300–325 degrees F., at which its light hydrocarbons of the gasoline type and the steam will be in the vapor phase after reduction of the pressure on the oil. * * * The cooled oil leaving the preheater passes through expansion valve 20 in pipe 19 to the expansion drum, which may be maintained under atmospheric pressure or if desired under a slight pressure of, say, 10 pounds, to assist in the expulsion of its liquid contents.

"On entering the drum 21 the light hydrocarbons formed in the conversion process and the steam are evolved as vapors, passing out through pipe 24, and the liquid products accumulate and may be withdrawn or expelled through discharge pipe 23. * * * The vapors and gases issuing through pipe 24 pass through condenser 25, in which their gasoline constituents and the steam present are condensed. The condensate and uncondensed gases and vapors pass on to receptacle 26 where the water and gasoline collect and are separated while the gases and vapors pass out through pipe 29 to a suitable holder. In the example given about 10 per cent. of distillate is formed and the converted oil has a density of about 14 degrees Be. and a viscosity of approximately 225 at 212 degrees F. and may be directly utilized as a fuel oil.

"The temperature to which the converted oil is reduced before it enters the expansion drum may be varied in accordance with the desired characteristics of the converted oil products. Thus, if cooled to 225 degrees F., the steam will be expelled and a liquid product of lower flash point and viscosity than above described will be produced. Or, if desired, the converted oil may be entirely cooled before pressure is released, and subsequently distilled to remove the light hydrocarbons. It is furthermore apparent that the process may be applied to other hydrocarbon oils and particularly to the heavy bottoms obtained in the ordinary reduction of such crudes as light Mexican crude, California crude or Mid-Continent crude."

Pyzel filed a motion to dissolve, the third ground of which read:

"(3). The Howard application is inoperative to carry out the process defined by the count of the interference in that it fails to disclose the use of a pressure sufficient to maintain the oil undergoing treatment in a substantially liquid phase."

Howard & Loomis filed a memorandum in response thereto, in which they, in part, said:

"The original Howard and Loomis application, in claim 5, specified the maintenance of a pressure of at least 60 pounds gauge on the oil and, thus definitely defined a minimum pressure for the operation.

"That the pressure conditions necessary to secure a substantial liquid phase operation in cracking processes are well known in the art is fully recognized by those having experience in the industry.'

In the same memorandum, in distinguishing the Forward patent No. 1,299,-449, Howard & Loomis stated:

" * * * There is no indication whatsoever in Forward of any desire to maintain such pressure at any point in his system as will maintain the oil substantially in the liquid state while at a cracking temperature";

and in distinguishing the Ellis patents Nos. 1,396,999 and 1,415,232; Howard & Loomis further stated:

"No inference can be drawn from the Ellis disclosures that the oil there under treatment is specifically in the liquid phase."

In the course of the interference, Howard & Loomis filed a further memorandum in which they stated:

"It has become a settled principle in decisions of the tribunals of the Patent Office relative to cases in the cracking art that those skilled in the art know what cracking temperatures and liquid phase pressures are and how to attain them. Consequently, if an applicant in his specification states that he secures a cracking temperature or has a pressure to maintain his material liquids, he is not compelled to further specify his temperatures and pressures in order to attain the use of a cracking temperature and a suitable pressure to keep his material in liquid phase."

In such interference proceeding, Howard & Loomis filed a further memorandum in which they, in part, said:

"In other words, Pyzel deliberately effects vaporization and as a natural result, must add to his heat input the additional heat necessary to supply the latent heat of the products so vaporized. He probably desires vaporization to get an increased velocity of travel through his reaction coils. However, that may be, to the extent that he secures vaporization while employing merely a pressure which does not permit complete vaporization, he departs from a mild heating required by the claim merely for maintenance of a cracking temperature of the oil while under a pressure such as to maintain it substantially in the liquid phase."

Thus, we learn from the applicant's own expressions, the significance of the phrases in the claims: "supplying heat at a slow rate" and "heated mildly."

Furthermore, in their specification, Howard & Loomis say:

"The pressure maintained upon the oil during its passage through the initial heating and converting coils is at least sufficient to maintain it substantially in the liquid phase during treatment."

Counsel for the Products Company contend the "once-through" limitation should be read in the light of Dubbs' patent, since it was inserted to avoid that patent; and that the Champlin Company does not employ a recycling operation like that disclosed in Dubbs' process.

560

The Dubbs' process is illustrated by the following simplified drawing:

FILED JAN.2,1918
ISSUED - DECEMBER 13,1927
PATENT NO. 1,652,67 - SERIAL NO. 636,104

CONDENSER
G.28
RECEIVING TANK
AERIAL CONDENSER
G.4
G.4
VAPOR LINES
CRACKING OF OIL HERE
4" HEATING TUBES
PUMP
G.5
FIRE
4" PREHEATING TUBES
FIRE
B.6
G.3
FIRE
10" DISTILLING TUBES
RESIDUUM DRAW OFF
G.6
F.4
F.5
F.2
PUMP

In Dubbs', the oil is passed first through a bank of four-inch preheating tubes and thence to a bank of four-inch heating tubes, and thence to ten-inch cracking and distilling tubes wherein the cracking and the separation of vapors from liquid residue takes place. From these ten-inch tubes, the vapors are let off through the upright pipes $G^6$ and $G^8$ to a dephlegmating or fractionating unit wherefrom the vapors of the product are led off to a final condenser $G^{28}$ and the vapors of the insufficiently cracked material are condensed and returned via the slanting pipes $G^1$ and $G^4$ to the points $G^5$ and $G^8$ and then back into the distilling tubes. It will be noted that in the inclined pipes $G^1$ and $G^4$ the ascending vapors from the distilling tubes are flowing countercurrently to the descending liquid. This is indicated in the drawing by a red (heavy black) line showing the vapors on their way to the dephlegmator, and a yellow (shaded) line to indicate the liquid returning to the distilling tubes. From these tubes the liquid residue (as shown by the specifications) is continuously withdrawn at the point marked "Residuum Draw-Off" through a residuum cooler (not shown in drawing) and into suitable storage and are not returned to the system. The rest of the material in these tubes is returned via the connection $F^3$ through the pump $F^1$ and the pipe $F^4$ to the inlet of the heating tubes at the point $B^6$, where it combines with the fresh feed coming from the preheating tubes. The combined streams of fresh feed and recycled material pass through the heating tubes and the cracking and distilling tubes. Thus, it will be seen that in the Dubbs' process, there is a recycling of the insufficiently cracked material mixed with some of the liquid residue remaining in the distilling tubes and fresh charging material.

Champlin Company, in the process employed by it, recycles the insufficiently cracked material from which the heavy residuum has been removed, mixed with gas oil from the low pressure still and from an outside source.

The only difference in recycling in the two processes is that Champlin Company recycles only the reflux from the dephlegmator, whereas Dubbs recycles this same reflux mixed with a portion of liquid residuum. Each adds new charging stock.

In Jensen-Salsbery Laboratories, Inc., v. O. M. Franklin Blackleg Serum Company (C.C.A.10) 72 F.(2d) 15, 18, the court said:

"Where an applicant for a patent on a mechanical combination or process is compelled by the rejection of his application by the Patent Office to narrow his claim by the introduction of a new element in the combination or a new step in the process, he cannot, after the issue of the patent, broaden his claim by omitting the element or step he was compelled to include in order to secure his patent. If dissatisfied with the rejection, he should appeal therefrom, and where, in order to get his patent, he accepts one with a narrower claim, he is bound by it. Whether the action of the Examiner was right or wrong, the court may not inquire. The applicant having limited his claim by amendment and having accepted a patent with such claim, brings himself within the rules: that, if a claim to a combination is restricted to specified elements, or a claim to a process is restricted to specified steps or a series of acts, all must be regarded as material; that limitations imposed by the applicant, especially those added by amendment after a claim has been rejected, must be construed against the inventor and regarded as disclaimers; and that the patentee is thereafter estopped to claim the benefit of the rejected claim or such a construction of his amended claim as would be equivalent thereto."

See, also, I. T. S. Rubber Company v. Essex Rubber Company, 272 U.S. 429, 47 S.Ct. 136, 71 L.Ed. 335; Weber Electric Co. v. Freeman Electric Co., 256 U.S. 668, 41 S.Ct. 600, 65 L.Ed. 1162.

We think it plain that Howard & Loomis is limited to a "once-through" operation and that Champlin Company recycles substantially in the same manner as in the Dubbs' process.

The limitation to a "once-through" process demonstrates that the Howard & Loomis process is primarily designed for viscosity breaking. A "once-through" operation is sufficient for viscosity breaking. It will produce the desired product, fuel oil and a small amount of gasoline. On the other hand, recycling is essential to efficient cracking where the primary object is to secure gasoline.

Counsel for Products Company seek to avoid the effect of the liquid phase limitation by asserting that Champlin Company employs a liquid phase process. They assert the vapor in Champlin Company's stills is so dense that "to all intents and to all practical purposes, it may be considered a liquid". They do not assert it is a liquid; they admit it is vapor; but they say it is so dense a vapor it is not practically different from a liquid. But liquids and gases are substantially different. Vapors are highly compressible. Liquids, while not entirely, are practically incompressible. Charging stock when cracked in the liquid phase produces gasoline of certain characteristics and when cracked in the vapor phase produces gasoline of essentially different characteristics. The latter is higher in octanes and more suitable for high compression motors. The gasoline produced by the Winkler-Koch stills possesses the characteristics of gasoline cracked in the vapor phase. This, we think, shows clearly that the vapor is not for practical purposes the same as liquid.

When the temperature is increased in the cracking coils, pressure must be increased to keep the charge in liquid form. Increasing the temperature speeds up the cracking and lessens the time factor.

In the Howard & Loomis process the heat is reduced in the second cracking zone, the temperature of the fluid raised only slightly and the time factor increased, while sufficient pressure is maintained to keep the charge in substantially liquid form. In the process employed by Champlin the temperature is constantly increased and the pressure decreased as the charge passes through the cracking coil. This speeds up the velocity of the stream, decreases the time factor, increases vaporization, avoids excessive carbon deposits, and effects cracking in both the vapor and liquid portions of the stream. Champlin Company uses a short time factor and recycles. Howard & Loomis being limited to a "once-through" operation and mild heating in the latter stage of cracking, if employed to crack for gasoline primarily, would necessarily have to use a long-time factor and would result in increased carbon deposit.

From the foregoing, it will be seen that, in addition to recycling and the liquid vapor phase present in Winkler-Koch and not in Howard & Loomis, the two processes differ in other essential characteristics.

There are a number of vapor phase processes in the prior art. (Hall patent No. 1,175,910; Alexander patent No. 1,-407,619; Greenstreet patent No. 1,740,-691.) Under each of these processes a clean charging stock is heated, vaporized and cracked in an initial coil. The streams are then cooled and the residuum drawn off and not returned through the system. The vapors are separated and taken off and the insufficiently cracked material is recycled.

The Hall process was used commercially in 1916 at Bayonne, New Jersey by the Texas Company. A vapor process was also used by Dr. Rittman in Oil City, Pennsylvania, as early as 1915.

We conclude that the claims in suit of the Howard & Loomis patent must be limited to a liquid phase "once-through" operation and that Champlin Company employs a substantially different process and does not infringe.

We hold further that if the claims in suit were construed broadly enough to embrace the process employed by Champlin Company, they would be void for anticipation.

### The Cross Patent

The objects of the invention stated in the specification are: to arrange the tubes in the combustion chamber in relation to the reflecting surfaces of the interior walls and the roof so as to materially reduce such reflecting surfaces and so that the tubes themselves will form reflecting surfaces receiving the radiant heat of the furnace directly, thus affording more efficient heat exchange and eliminating excessive heating of the reflecting surfaces and consequent deterioration of the walls: and to make possible the utilization of higher temperatures in the combustion zone by effecting a more ready transfer of the heat to, and removal of the heat by the fluid medium, thus effecting maximum combustion and a saving of fuel.

The specification, in part, reads:

"The novelty in arranging tubes in this manner, adjacent and in close proximity to the interior side walls and roof, is to eliminate materially the amount of direct

radiant heat which is projected onto the side walls and interior roof surfaces producing deterioration due to the excessive temperatures present. In a heater where the tubes are positioned centrally in the combustion space, a considerable part of the heat absorbed by the tubes is reflected heat from the walls of the chamber and where high temperatures are an advantage objectionable deterioration is an ever present factor.

"Where the tubes are positioned in close proximity to the side walls and where they cover at least 50% or more of the side wall and upper reflecting surfaces, they receive the direct radiant heat of the chamber and due to the fluid medium coursing therethrough carry away this heat more rapidly than tubes positioned centrally in a combustion space. A heater of this character affords a means for maintaining higher temperatures than have heretofore been usual, permitting more complete and efficient combustion or what might be termed as optimum combustion conditions wherein there is a minimum amount of air introduced, an increased percent of carbon dioxide and a substantial absence of carbon monoxide present in the combustion gases than has heretofore been possible under temperatures existent in a heater or furnace."

The claims in suit are set out in the subjoined note 3.

[3] "4. A tubular oil cracking still comprising a combustion chamber, a heating chamber through which the heating gases are passed from the combustion chamber, two banks of tubes in said heating chamber extending transversely to the general direction of flow of the heating gases and successively traversed by the latter, tubular elements adapted to absorb radiant heat from the combustion chamber, and connections to and between said tubes and elements for passing the oil to be heated first through the tubes of the tube bank in the heat chamber last traversed by the heating gases, with a direction of oil flow therethrough generally counter to the direction of flow of the heating gases over the tubes, and then passing the oil through the radiant heat absorbing elements, and finally passing the oil through the tubes of the bank in the heating chamber first encountered by the heating gases, with a direction of oil flow through the last mentioned tubes generally parallel to the direction of flow of the heating gases over the tubes.

"5. In an oil heater of the type comprising a combustion chamber, a heating chamber which is separated from the combustion chamber, a bridge wall over which the heating gases pass from the combustion chamber into the heating chamber which has a heating gas outlet at its lower end, and also comprising upper and lower groups of horizontally disposed tubes arranged in superimposed rows in said heating chamber, and conduit elements absorbing radiant heat from the combustion chamber and from the heating gases before the latter come into contact with said tubes, the improvement which consists in connections to said tubes and elements for first passing the oil successively through tubes of the lower group located at successively higher levels, and for then passing the oil through the radiant heat absorbing elements, and for finally passing the oil successively through tubes of the upper group located at successively lower levels."

The following is an isometric drawing of the Cross tube arrangement.

○ Preheating Tubes

◉ Radiant Tubes

◉ Superheating Tubes

The elements of claim 4 are:

(1). a combustion chamber;

(2). a heating chamber through which the heating gases from the combustion chamber pass;

(3). two banks of tubes (orange [shaded] and gray [unshaded] tubes) in the heating chamber extending transversely to the general direction of flow of the heating gases and successively transversed by the latter;

(4). tubular elements (red [black] tubes) adapted to absorb radiant heat from the combustion chamber;

(5). connections between such tubes and elements:

(a). for first passing the oil to be heated through the tubes of the tube bank in the heating chamber last transversed by the heating gases (gray [unshaded] tubes) with the direction of flow of oil therethrough generally counter to the direction of flow of heating gases over the tubes;

(b). next passing the oil to be heated through the radiant heat absorbing elements;

(c). and finally passing the oil through the tubes in the heating chamber first encountered by the heating gases with the direction of flow of oil therethrough generally parallel to the direction of flow of the heating gases.

The elements of claim 5 are:

(1). a combustion chamber;

(2). a heating chamber separated from the combustion chamber;

(3). a bridge wall over which the heating gases pass from the combustion chamber into the heating chamber;

(4). a gas outlet at the lower end of the heating chamber;

(5). upper and lower groups of horizontally disposed tubes arranged in superimposed rows in the heating chamber;

(6). conduit elements absorbing radiant heat from the combustion chamber and from the heating gases before they come in contact with the tubes in the heating chambers;

(7). connections to such tubes and elements for:

(a). first passing the oil successively through the tubes of the lower group at successively higher levels;

(b). next passing the oil through the radiant heat absorbing elements;

(c). and finally passing the oil through the tubes of the upper group at successively lower levels.

It will be observed that there is little, if any, relation between the elements of these claims and the objects of the claimed invention set forth in the specification.

The heater consists of two chambers, a combustion chamber and a convection heating chamber separated by an intermediate bridge wall. (Not shown in drawing.)

The tubes colored red [black] are positioned parallel to the walls and roof of the combustion chamber and are heated by radiant heat in the combustion chamber and partially by the heating gases before they pass over the bridge wall.

The tubes colored orange [shaded] and gray [unshaded] are positioned in the heating chamber. They are heated by convection heat from the gases generated in the combustion chamber and which flow over the bridge wall and downward to the outlet at the bottom of the tube chamber.

The oil enters the furnace at point 10 and flows through the gray [unshaded] or preheating tubes, traveling countercurrently to the flow of the gases, then into and through the red [black] or radiant tubes and finally into and through the orange [shaded] or convection tubes first traversed by the convection gases, traveling concurrently with the flow of the gases.

The furnace employed by Champlin is illustrated by the following drawing:

It consists of a combustion chamber (1), a convection heating chamber at the rear of the furnace, a bridge wall (2) separating the two chambers, a bank of tubes (4) in the roof of the combustion chamber called the roof bank, an upper (6), a middle (9) and lower (3) bank of tubes in the heating chamber, the lower being the preheating bank.

The roof bank is heated by radiant heat in the combustion chamber.

The other three banks are heated by convection heat from the heating gases which pass up over the bridge wall and downwardly about the tubes in such banks.

The oil enters through the "oil inlet" pipe and passes through the preheater tubes of bank (3) traveling countercurrently to the flow of the heating gases; it then passes through transfer line (5) to the next to the top tier of the upper bank (6)—(not to the radiant heated roof tubes as required in the claims in suit), and through that tier and the top tier of upper bank (6), such tiers of tubes being the first in the heating chamber which are encountered by the heating gases. In passing through the tiers last mentioned, the oil does not travel concurrently with the flow of the heating gases, as required in the claims in suit, but countercurrently thereto. The oil then passes through transfer line (7) into the lower tier of tubes of the roof bank and through the roof bank tubes; it then passes through the transfer line (8) to the top tier of the middle bank (9) or the third from the top of the tiers of tubes in the heating chamber (not to the tubes in the heating chamber first encountered by the heating gases as required in the claims in suit); it then passes through the ten tiers of tubes in the middle bank traveling concurrently with the flow of gases and out of the furnace through outlet (11).

It was old in the art of liquid heating, when the Cross application was filed, to so arrange the tubes that the cool liquid would first enter the furnace in the path of the escaping heating gases near their outlet, and travel countercurrently thereto; that it next would travel through the hottest portion of the furnace and be subjected to the radiant heat; and that it would then re-enter the path of the escaping gases and travel concurrently therewith, thus fully utilizing both the radiant and convection heat of the furnace.

It was disclosed by the prior patent to Underhill, No. 235,659; the patent to Wright, No. 479,869; and the patent to Schneider, No. 1,246,332.

It is also disclosed by the Lemp patent, No. 767,071; and Clarkson, No. 651,-593, which also employ bridge walls as in claim 5.

■ Every element in a combination is conclusively presumed to be material. The omission of one element of a combination claim avoids infringement of that claim, whether or not the element was essential to the combination. Jensen-Salsbery Laboratories v. O. M. Franklin B. Serum Co. (C.C.A.10) 72 F.(2d) 15, 18, 19, and cases there cited.

■ Aside from the details of the arrangement of the tubes in the furnace and the specific way in which the oil flows through the tubes, in respect of which the device employed by Champlin is substantially different from the claims in suit, such claims are fully anticipated by the prior art.

■ Because Champlin Company omits elements of the claims, we hold it does not infringe.

■ Furthermore, it is our opinion that the details of the arrangement of the tubes in the furnace and the specific way in which the oil shall flow through the of an ordinary mechanic skilled in the art; and that the claims in suit are void for want of novelty.

The decree is affirmed.