**TEXAS CO. v. ANDERSON–PRICHARD REFINING CORPORATION.**

No. 2171.

Circuit Court of Appeals, Tenth Circuit.

Sept. 2, 1941.

Rehearing Denied Nov. 3, 1941.

Drury W. Cooper, of New York City (Benjamin B. Schneider and Newton A. Burgess, both of New York City, Brady Cole, of Houston, Tex., and B. A. Ames, of Oklahoma City, Okl., on the brief), for appellant.

Thorley von Holst, of Chicago, Ill., Arthur C. Denison, of Cleveland, Ohio, and J. Bernhard Thiess, of Chicago, Ill. (Joseph G. Carey, of Wichita, Kan., J. H. Jarman, of Oklahoma City, Okl., and Sidney Neuman and Robert W. Poore, both of Chicago, Ill., on the brief), for appellee.

Before PHILLIPS, BRATTON, and MURRAH, Circuit Judges.

PHILLIPS, Circuit Judge.

The Texas Company brought this suit against Anderson-Prichard Refining Corporation[1] for alleged infringement of claims 12, 14, 19, 21, 22, 23, 25, 29, 35, 36, 38, 39, 40, and 41[2] of patent No. 1,883,-

---

[1] Hereinafter called the Refining Corporation.

[2] On the appeal, claims 38 and 41 are not pressed.

850. It was applied for November 21, 1918, and granted October 18, 1932.[3] From a judgment dismissing the suit, Texas Company has appealed.

In their brief, counsel for Texas Company state that claim 39 may be regarded as typical. It reads as follows:

"39. A process of cracking oil which comprises

"(1) subjecting oil in a fired heating zone to a cracking temperature solely by the application of external heat,

"(2) delivering the highly heated oil into a heat insulated zone where separation of vapors from residual oil takes place,

"(3) discharging the residual oil,

"(4) subjecting separated vapors to partial condensation to separate out the heavier constituents thereof as a condensate,

"(5) removing uncondensed vapors,

"(6) and positively returning condensate unmixed with residual oil by maintained mechanically applied pressure to the heating zone for further treatment, and

"(7) continuously supplying charging stock to the process."

In his specification Behimer states, "This invention relates to methods of making condensable light oils, such as gasoline"; in prior methods of cracking hydrocarbon oils, carbon forms on the sides of the tubes and stills exposed to sufficient heat to effect the cracking operation; the carbon causes choking of the tubes and coils and crystallizes the metal surfaces, thereby decreasing the tensile strength of the metal causing it to bulge and break; and in cracking oil for gasoline, there is generally formed a considerable quantity of vapors heavier than gasoline, generally called kerosene; and that under existing methods, it has been found difficult to crack kerosene into lighter products.

He further states: "It is a broad novel feature of the herein disclosed process that substantially all of the cracking operation occurs in a vessel to which no external heat is applied, except at such times and in such quantities as are necessary to compensate for heat losses, the oil prior to its introduction to such vessel having been subjected to a high degree of cracking heat and the excess heat of the oil itself being used to effect its own decomposition. As a consequence, I avoid substantial carbon formations. * * * The removal of the cracking operation from the heating zone also reduces the danger from fires. * * *"[4]

---

[3] The original application was filed by Messrs. Holmes, Manley, and Behimer.

[4] In the specification Behimer described his process substantially as follows: It embodies a novel cyclic system in which oil is maintained under varying liquid and vapor phases. The oil on entering the circuit is subjected to a high degree of heat but the time element is so controlled that there is comparatively little cracking while the oil is exposed to external heat, the oil being rapidly removed from the heating zone to the cracking zone where, without necessarily being subjected to additional heat, it undergoes a molecular decomposition whereby carbon and like products are formed and liberated.

Cracking is dependent on relative conditions of pressure, temperature, and time. The necessary pressure and temperature must be maintained for a sufficient period of time to enable cracking to take place. The time factor is controlled by regulating the rate of heating the oil passing through the heating zone so that the temperature is raised progressively in transit and reaches the desired cracking temperature (700° to 900° F.) just previous to its exit from the heating zone. Thus, the oil leaves the heating zone before any substantial cracking and incident deposition of carbon takes place. The highly heated oil, in a state of incipient cracking, is delivered to the cracking zone where temperature (700° to 850° F.) and pressure (100 to 400 pounds) conditions are maintained and the cracking of the oil and incident deposition of carbon are effected. "The outlets from the circuit are so controlled that the entire system is maintained under a pressure sufficient to insure the desired" cracking. The bulk of the carbon is removed from the circuit by withdrawing from the cracking zone portions of the residue oil. While "the process, in its broad conception, is complete at this stage, * * *" preferably the light products continue the cycle leaving the cracking zone in the form of vapor and gas and are subjected to a reduction in temperature whereby the heavier constituents are condensed into kerosene. The condensate or reflux, preferably at a temperature not materially below its boiling point, is forced under mechanical pressure into the charging stream entering the heating zone, thus completing the cycle. The constituents of desired volatility are removed from the circuit and condensed. [Italics ours.]

An apparatus for utilizing the process is illustrated by the following patent drawing:

Fig. 2.

Fig. 1.

Behimer described the process with reference to the apparatus illustrated, substantially as follows: The oil to be treated is forced through the charging line 7 under considerable pressure and is rapidly flowed through the heating coil 1 where it is heated to the desired cracking temperature.[5] The oil in passing through the coil acquires a high cracking temperature but, due to the rapidity of its flow, cracking is in the incipient stages only when the oil is discharged through pipe 9 into the heat-insulated cracking drum 11 where

[5] It will be observed that the oil enters the furnace at the top, the coolest part of the furnace, and leaves through the bottom, nearest the fire, the hottest part of the furnace.

a constant body of oil is maintained at a cracking temperature under pressure. The distributor 9a discharges the oil into the cracking drum in a wide stream thereby mixing the hot oil with the body of oil maintained in the drum and diffusing the heat there-through. The rapid flow of the oil through the coil where it is closely confined is suddenly retarded as the oil enters the drum which is of ample volume. The excess heat of the oil maintains the body of oil in the drum at the desired cracking temperature and cracking is effected. The vapors and gases generated gather in the upper part of the cracking drum and pass out through vapor outlet 13 to the separator 15 where there is a separation of hydrocarbons of desired volatility from those of less volatility. The former pass out through the vapor line 16 to condenser 18 where they are condensed. The condensed distillate passes to the collecting tank 21.

The temperature in the separator 15 is such that the less volatile hydrocarbons are condensed and dropped into conduit 17, by which they are conducted while still hot to the jet in the charging line or other suitable mechanical pressure device for forcing them into the charging stream. The pressure in the charging stream is maintained from 50 to 100 pounds higher than the pressure in the drum. This insures that the reflux in conduit 17 shall be constantly and positively drawn into the charging line. This hot condensate thus introduced into the charging line increases the volume of oil in the heating coil, accelerates the flow therein, producing a foamy mixture, prevents local overheating in the coil and keeps it free from carbon formations. This reflux does not yield any great amount of carbon and dilutes the carbon-forming charging stock. The reflux reaching the coil while hot also contributes to the maintenance of the proper temperatures "in the heating coil and cracking drum." The residuum is withdrawn through draw-off valve 12 at a rate which maintains a constant body of oil in the cracking drum. Auxiliary heat may be applied to the cracking drum sufficient to offset the loss of heat due to radiation and distillation.

Behimer states that by the foregoing described processes he avoids carbon formation in the heating coil, successfully cracks kerosene fractions in the reflux, and obtains a cracked product remarkably sweet or low in unsaturated compounds.

At the time Behimer commenced the experiments which resulted in his discovery, it was well known that heavier hydrocarbons would decompose or crack into lighter constituents upon being subjected to a proper temperature for a sufficient period of time. Commercial cracking processes to make gasoline had been successfully carried out by heating and cracking oil in directly fired drums or tanks and in directly fired tubes or coils.

In all such processes then practiced and since developed, the principal problem to be solved arises from the fact that when hydrocarbon oils are subjected to the temperature and time necessary to crack them, the molecular rearrangement or chemical reaction, known as cracking, tends to produce carbon and heavy materials rich in carbon. The deposit of carbon on highly heated surfaces insulates the metal, causes it to become overheated and lessens its strength, causing the coils or drums to bulge, burst, or crack.

Long prior to Behimer, it was fully appreciated that carbon-laden residue from a cracking operation should never be returned as a charge to the same operation nor used as a charge to another operation. In the prior Burton drum, Rittman tube, and de Florez coil cracking processes, the residue was cleaned up by distillation and only clean condensed vapors were used as charging stock.

Dephlegmation of the vapors resulting from the cracking operation and refluxing the insufficiently cracked portion of the vapors were commonly practiced and well known in the commercial art before Behimer. Dephlegmation is a necessary part of any cracking operation because due to Dalton's law of partial pressure, the vapors of the desired product, kerosene or gasoline as the case may be, always leave the still mixed with vapors of heavier material which must be separated out by cooling and condensing them. This insufficiently treated material, so condensed, is usually referred to as reflux. In drum cracking processes such as Burton's, the reflux was continuously returned by gravity, while still hot, to the cracking drum. In the once-through tube or coil cracking process, it was separated out and returned subsequently either in the same or in a later operation.

The prior patent art [6] had broadly taught the steps in a cracking process of returning reflux to the heating zone for further treatment and continuously withdrawing the carbon-containing residue and not returning it to the system.

The continuous coil cracking process of Rittman and de Florez operated with continuous charge and continuous withdrawal and nonreturn of residue. They did not return the hot reflux for retreatment during the operation due to the lack of a pump suitable for handling the hot materials.

A continuous once-through coil cracking process with residue withdrawn was taught in British Benton patent No. 1922.

Before Behimer entered the field, there were in commercial operation, two schools of cracking, one, the liquid phase method where a body of liquid oil was cracked and distilled generally in a tank or drum maintained under superatmospheric pressure, and the other a vapor and liquid vapor phase where the oil was heated and vaporized either completely or to a substantial degree, and cracked in a tube or coil.

Liquid phase processes were at first preferred because they operated at low temperatures and with a long time factor and made a product most closely resembling the white, sweet, natural gasoline, low in unsaturates, of simple distillation operations which was the standard product when Behimer entered the field. Vapor or liquid vapor phase processes operated at high temperatures and with a short time factor and made a product unlike natural gasoline, being rich in unsaturates and of bad color and foul odor, and difficult to treat.

In drum cracking liquid phase processes, pressure is necessary to insure the time factor and thereby insure cracking. By maintaining pressure, the boiling point of the liquid oil is materially raised. The oil is kept in the liquid state for a sufficient period of time to be cracked and vaporization does not occur until the cracking has resulted in the formation of lighter products such as gasoline and kerosene.

The unsaturates above referred to impart an antiknock quality to gasoline. With the development of the high-compression motor and the consequent demand for an antiknock gasoline, the vapor and liquid vapor phase processes came into favor.

The apparatus by which the Refining Corporation's process is utilized is illustrated by the simplified drawing on the opposite page.

The cracking tubes form a continuous coil of pipe approximately one mile in length. They are arranged in five series, the first consisting of 48, the second 16, the third 65, the fourth 48, and the fifth 32 tubes. The first or upper series of tubes that extend out over the fire are called the roof bank. The several series of tubes below the roof bank are called the convection bank and are separated from the furnace fire by a bridge wall to the left thereof. The heated gases from the fire pass upward over the bridge wall, thence downward through the convection bank to a collecting tunnel and out through a stack. The roof bank extends out over the fire and receives its heat primarily by direct radiation from the fire and from the brick walls of the furnace. The convection bank is heated by convection heat from the gases and also by heat radiated from the gases and brick walls of the furnace. The roof bank and the upper series of the convection bank, being nearest the fire, receive the highest degree of heat, while the lower series of the convection bank, being farthest from the fire, receive the least amount of heat. The tubes in the roof bank are staggered so that each tube receives direct radiant heat from the fire and the brick walls.

The charging stock is forced into the lowest series of the convection bank by means of the reflux pump at a pressure of 1150 pounds per square inch and at a temperature of 590° F. The furnace temperature about this bank is 933° F. The oil travels in a direction counter to the flow of the gases in the furnace. The temperature of the oil is raised to 665° F. in this lower series. The oil then flows to the upper series of the convection bank traveling as indicated by the arrows on the drawing where the furnace temperature is 1325° F. As the oil leaves the upper series of the convection bank its temperature is raised to 735° F., a cracking temperature, but one at which cracking proceeds at a relatively slow rate. The oil then travels through the roof bank series as indicated by the arrows and when it leaves those series it has reached a tem-

---

6 Pielsticker U. S. Patent No. 477,153, British No. 1,308; Hall No. 1,175,910; Ellis No. 1,396,999.

| Charge to Furnace | B/D | Volume Per Cent |
|---|---|---|
| Charge to Furnace | 5860 | |
| Topped Crude Charged | 1921 | 53.0 |
| Gas Oil Charged | 1698 | 47.0 |
| Total Charged | 3619 | 100.0 |
| Pressure Distillate Produced | 1607 | 44.4 |
| Residuum Produced | 1693 | 46.8 |
| Total Liquid Products | 3300 | 91.2 |
| Gas and Loss (by difference) | 319 | 8.8 |

perature of 911° F.[7] By the time the oil leaves the roof bank about 13 per cent of the stream has been cracked and about 15 per cent of the stream has been vaporized. The oil then passes downward through the remaining series of the convection bank and reaches a temperature of 926° F. When it passes into the outlet line, the pressure has been reduced to 400 pounds and about 24 per cent of the stream has been cracked. By the time the oil has completed its cycle through the cracking tubes about 95 per cent of it by weight and about 99 per cent by volume has been vaporized.

The oil enters the furnace at a velocity of 10 feet per second. As it travels it expands as the result of heating and be-

[7] After oil reaches a cracking temperature the rate of cracking doubles with approximately each 20 degrees of increase in the temperature.

gins to vaporize. This increases the velocity so that when it leaves the roof bank it is traveling 15 feet per second. As it leaves the cracking coils it is traveling at approximately 55 feet per second. It passes through the one mile of coil in about five and one-half minutes.

Valve A is a pressure controlled valve. It is so adjusted as to maintain the pressure in the tubes at the point where the outlet tube connects with the valve at 400 pounds per square inch.

After the oil passes through valve A at a pressure of 400 pounds, the pressure decreases between the valve and the separator to 26 pounds. This release of pressure causes a substantial drop in temperature. The oil is further cooled by a stream of topped crude oil which is pumped into the transfer line between valve A and the separator. This further reduces the temperature from 926° F. at the valve to 758° F. in the bottom of the separator. Were the temperature not thus reduced, practically all the material coming from the cracking tubes by vaporization would pass out through the top of the separator. The heat exchange effects a distillation of the topped crude.

A small amount of liquid, approximately 12 barrels, is maintained in the bottom of the separator, which has a capacity of approximately 300 barrels, to seal it against vapors and prevent them from being drawn out through the residuum drawoff.

The vapor enters the separator at a velocity of 500 miles per hour due to the great expansion. This hot stream of vapor striking the topped crude at this high velocity tears it up into small particles creating a mixture of hot vapor and entrained heavy oil particles. The liquid in the bottom of the separator is churned and agitated into a froth by the stream of vapor. The vapors rise through the froth and pass upward and out of the top of the separator through the vapor line. The liquid froth is continually dropped back to the bottom of the separator and the entrained droplets or residuum tend to settle out and fall to the bottom as the vapors pass to the top of the separator. The residuum is drawn off through the line at the bottom of the vapor separator so as to maintain substantially the same amount of liquid in the separator at all times. A small amount of residuum comes from the oil that has passed through the cracking coil but the larger part comes from the topped crude. The heated vapors crack about one per cent of the topped crude. A small amount of cracking results from any distillation process.

The vapors that pass out of the separator consist of gas, gasoline, and heavier constituents and some entrained residuum not separated out. These vapors pass into the bubble tower at a temperature of 752° F. and flow through a series of bubble decks where they are subjected to a gradual cooling. This produces condensation and a washing of the gases by the condensate which flows down the bubble decks counter to the flow of the vapors. The result is that the heavier stock is condensed and flows down to the bottom of the bubble tower where it accumulates as a clean charging stock and is picked up by the reflux or hot oil pump and charged into the cracking coil. The cracked distillate and gas pass out of the bubble tower to the condenser where the distillate is condensed and the gas remains uncondensed. From there the gas is carried to a gas separator where the gas is separated from the distillate entrained therein.

The cooling of the bubble tower is effected by introducing cold distillate at the top of the bubble tower. The exchange of heat cools the vapors and condenses the distillate and it again passes out through the top of the bubble tower.

Cold gas oil is also pumped into the bubble tower about midway between the top and bottom thereof and is heated by the vapors and tends to effect further condensation thereof. This adds to the condensed material the necessary additional clean cracking stock.

In the process, charging stock is used which is sufficiently clean to avoid carbon formation in any substantial amount in the coils. However, over a period of time, a small amount of carbon forms in the tubes, the separator, and the bubble tower. The tubes are equipped with removable plugs at the ends thereof. These plugs are removed and the carbon is loosened by an air-driven turbine cleaner having cutting edges which rotate at high speed and cut and loosen the coke. The latter is blown out by exhaust air from the turbines.

Ninety-nine per cent of the cracking takes place in the cracking coils. Cracking ceases when the oil passes through valve A, due to the reduction in temperature.

Pressure is not an essential factor in cracking. Oil cracks when it is subjected to

sufficient temperatures irrespective of pressure and irrespective of whether it is in a liquid or vapor state. However, the vapors must be confined and not permitted to pass off until sufficient time has elapsed for their cracking. Increased pressure simply raises the boiling point and maintains the stock in a liquid state.

In the alleged infringing process the liquid and vapors as they pass through the coil are subjected to cracking temperature and neither being able to escape until it reaches valve A, are subjected to the same time factor and crack together.

In the alleged infringing process harmful carbon formation is prevented by the use of a clean charging stock, by regulating through the use of precise measuring and recording instruments, the amount of cracking in the coil, or the crack per pass, short of the point where experience has demonstrated harmful carbon deposits will result, and by stopping the cracking operation at valve A. Local overheating or burning of the oil in the tubes is also prevented by modern furnace construction and tube arrangement which effects an even distribution of the heat and prevents direct contact between the flames and the furnace and the tubes.

The product produced is yellow colored, strong smelling, and rich in unsaturates which impart to the gasoline antiknock qualities.

On March 19, 1919, Carbon P. Dubbs filed an application on which patent No. 1,392,629 issued on October 4, 1921, while the Behimer application was still pending. On December 26, 1922, Behimer presented claim 42 [8] in his application. The Patent Office held it covered subject matter substantially identical with that covered by certain claims of the issued Dubbs patent. The Dubbs claims were the same as Behimer's claim 42, except that Behimer did not have Dubbs' first step limitation against permitting "substantial vaporization" of the oil in bringing it to the cracking temperature in the coil, an immaterial difference. On January 26, 1923, the examiner

notified Behimer that by claim 42 he was claiming substantially the same subject matter as that defined in certain claims of the Dubbs patent; and that for the purpose of an interference, Behimer should copy claims 1, 7, and 9 of the Dubbs patent. Behimer acquiesced in the examiner's suggestion and on April 6, 1923, filed a divisional application on which the patent in suit finally issued, copying therein all the Dubbs claims, except claim 6, and claim 42 of the original Behimer application. Interference No. 49,355 was declared on June 8, 1923, the issue counts being all the claims of the Dubbs patent, except No. 6 thereof.

The interference pended for a period of eight years. No suggestion was ever made during that period that the limitation in the Dubbs claims created a distinction between the respective claims of Dubbs and Behimer. On December 12, 1918, Dubbs filed application No. 266,396 containing certain claims which were indistinguishable from those of his patent No. 1,392,629, save (1) that they were not limited to "without substantial vaporization" in the coil and (2) that they included the return of the reflux with a pump. The claims of Dubbs' patent No. 1,392,629 did not specify the means of returning the reflux. These pump claims were rejected on the ground of double patenting over Dubbs' patent No. 1,392,629. Dubbs appealed. The appellate tribunal reversed, holding that the substitution of mechanical pressure for gravity feed for returning the reflux to the charge differentiated the process from the claims of the prior Dubbs patent and that the process claimed embracing the mechanical pressure step was patentable. The Dubbs pump claims were thereupon incorporated in a divisional Dubbs application No. 6060, and because of the identity of subject matter in certain Behimer claims, Nos. 10, 11, 20, and 22 which also called for a mechanical pressure for returning reflux, Interference No. 55,610 was declared on July 15, 1927, involving the issue of priority on the element of returning reflux with a pump. [9]

---

[8] The claim read as follows:
"A process of oil conversion that consists in passing the oil once through a heating coil and into a drum where a body of liquid oil is maintained and vapors evolved, separating the heavier constituents of the evolved vapors and returning them to the heating coil for retreatment, removing the residuum from the drum without recirculating it through the coil,

and maintaining superatmospheric pressure through the coil and drum."

[9] In the interference proceedings, Behimer stated that the novelty of the counts in 49,355 consisted in the clean circulation idea and in 55,610 the idea of positively and forcibly returning the condensate with a hot oil pump for retreatment in a clean circulation system.

Pursuant to an agreement entered into between the respective assignees of Dubbs and Behimer, Behimer entered a disclaimer of all the counts of the clean circulation Interference No. 49,355 and Dubbs entered a disclaimer of the pump Interference No. 55,610.

Thereupon, Behimer's divisional application was in condition for further prosecution. Claim 42, renumbered as claim 14, and other claims not already limited to a pump were rejected on the prior art patent to Trumble and on the issue of the clean circulation Interference No. 49,355. Behimer did not appeal from this rejection, but acquiesced therein, and rewrote the claims and amended them to include specifically for reflux return "under mechanical pressure," that is, by means of a pump. [10]

Upon termination of Interference No. 55,610 by the disclaimer, the claims in the Behimer application, which included mechanical pressure or pump return of condensate, were allowed. All subsequent claims added by amendment of July 7, 1932, were likewise limited to mechanical pressure return of condensate. All the claims in suit are so limited.

The record reflects many instances where, in the patent proceedings, Behimer interpreted the process of the Behimer invention as a coil heating, drum cracking process which solved the carbon problem by preventing cracking in the coil, thereby removing the cause of carbon formation therein; interpreted the Behimer process as permitting no substantial cracking in the coil; analyzed the original Behimer specification and claims and the early prosecution as clearly teaching heating in the coil without substantial cracking; distinguished coil cracking processes such as Dubbs and Trumble from Behimer's invention because they dealt with the carbon problem by limiting the cracking in the processes and by sweeping the carbon from the coil with velocity, whereas Behimer solved the carbon problem by avoiding its cause, namely, cracking in the coil; recognized that the vaporization occurring in a coil cracking operation after pressure release into a drum is not the vaporization occurring in Behimer's drum where a substantial body of oil is maintained and vaporization results from cracking; recognized that the step of returning reflux to the inlet of the coil was a mere auxiliary refinement in the basic coil heating, drum cracking steps; recognized the lack of equivalency between cracking in a coil, and heating in a coil and cracking in a drum as in Behimer, by distinguishing other disclosures and references on that ground; recognized that the Behimer process embodied a flow of oil whereby the cracking temperature is reached only at the time the oil emerges from the coil, as contrasted with the opposite flow in coil cracking processes.

As representative of such statements and the position maintained by Behimer throughout the prosecution of the patent proceedings, we quote statements by Behimer from the patent proceedings in the subjoined note. [11]

---

[10] In support of claim 14, formerly 42, Behimer stated:

"Some of the previous claims were rejected over the issues of Interference 49,355. Attention is called to the fact that all of the claims, as now presented, are clearly and patentably differentiated therefrom by the inclusion among other features, of applicant's forcible or mechanical pressure return of condensate to the heating coil or to the charging stream, a feature which characterized the counts of Interference 55,610 which were awarded to applicant."

[11] In the Behimer parent application he stated:

"One of the prime elements of the invention is that the heating zone and the cracking zone are separate and distinct. The oil is heated to a cracking temperature in * * * a coil and is then delivered in a highly heated condition into an enlarged * * * drum where a body of oil is maintained, * * * where the decomposition or cracking takes place. The oil in passing through the heating zone is raised to a cracking temperature but the rate of heating the oil in transit is so controlled by relative regulation of the furnace heat and rate of flow of the oil that the oil is brought to a cracking temperature at about the time or a little before it reaches the exit of the heating coil."

Referring to the Ellis patent, No. 1,-415,232, Behimer stated:

"It will be noted that substantially all of the * * * cracking occurs in the decomposing tubes. This is diametrically opposed to the operation of applicants' invention, in which no cracking, or at least no substantial amount of cracking, takes place in the heating coil."

In Interference 49,654, Behimer stated:

"Applicant-interferants * * * de-

122 F.2d 829

In the vapor phase or liquid vapor phase oil cracking process, pressure is not essential to effecting either distillation or cracking. Many such processes operate at low pressure. As vapors form in the cracking coil, they cannot escape but must travel along and are cracked with the liquid. Pressure has no relation to the cracking operation itself but merely serves to economize on the length of the coil by compressing the vapors

vised a method to prevent, * * * the * * * cracking of the oil within any part of the apparatus which is externally heated. * * * They have segregated, as far as possible, the heating step and the * * * cracking step, by rapidly imparting the heat to the oil in a * * * coil subjected to high external temperatures where substantial * * * cracking was inhibited and effected substantially all of the * * * cracking in a zone * * * separate and apart from the heating zone."

In Interference 52,305, Behimer stated:

"Diametrically opposed to the efforts of others, Holmes et al. concentrated their endeavors on the cause [of carbon formation] as distinguished from the effect."

"They segregated, as far as possible, the heating step and the * * * cracking step, by imparting the heat to the oil in a zone subjected to high external temperatures where substantial * * * cracking was inhibited and effected substantially all of the * * * cracking in a zone remote from the heating zone."

In Interference 52,543, Behimer stated:

"The position of Holmes et al. [Behimer] has always been, is now and will continue to be that the processes of Holmes et al. and Dubbs are the antithesis of each other in that in the former practically all the * * * cracking takes place in the drum, while in the latter practically none takes place therein."

"The Behimer principle is a reversal of the prior art principle exemplified by Trumble.

"Instead of heating and forming carbon in the same receptacle (e.g., the coil), Behimer heats in one receptacle (the coil) and forms carbon in another (the drum)."

"The Trumble patent further indicates that the cracking is confined to the tubes by the fact that it assigns no cracking to the drum, but on the contrary assigns thereto only the function of vapor releasing which had always been the function in the drum of the prior art systems in which the cracking was done exclusively in the coil."

In Interference 49,656, Behimer stated:

"Oil boils below a cracking temperature and would go off in vapor before a cracking temperature could be attained, except for the pressure which raises its boiling point and holds it in liquid form until cracking takes place. When cracking takes place, light oil such as gasoline and kerosene, are formed. These oils boil at a lower temperature and hence vaporize in spite of the pressure maintained. It is the vaporization of these light oils (which result from cracking) which takes place in the drum of Holmes et al."

"In the Dubbs vaporizing chamber the pressure which was maintained on the oil in the cracking tubes, where cracking takes place, is largely dropped as the oil enters the drum, thereby lowering the boiling point of all of the liquid, whether cracked or uncracked, and causing not only any gasoline and kerosene, formed by cracking in the coil, to vaporize but also the uncracked starting material to be immediately vaporized and carried over into the dephlegmator. This immediate and extensive vaporization resulting from the drop in pressure is accompanied by sufficient absorption of heat to preclude any cracking taking place in the drum."

"Holmes et al. have found it desirable * * * to effect distillation in the drum and to return the condensate, resulting from subsequent separation, to the heating coil for repassage through the system. * * * The basic principles of operation, however, are entirely independent of these auxiliary features of refinement. In the broad aspect of the invention, these features may be omitted, without altering or affecting the general mode of operation."

In the Behimer parent application he stated:

"Applicant does not contend that the counter-current flow of combustion gases and oil is new per se but does contend that the combination steps set forth in claim 82 is patentably different from the Trumble plus Ellis combination. In the particular process of applicant, the counter-current flow gives new and unexpected results in that it enables applicant to impart the final temperature to his oil near the exit of the coil. * * * As a matter of fact, instead of the counter-current flow affording an advantage to Trumble it would have the directly opposite effect because in Trumble the oil is cracked in the coil and it is, therefore, an advantage to submit the oil to the highest temperature as it enters the coil in order to bring it to a cracking temperature as rapidly as possible."

into a smaller space. On the other hand, in drum cracking processes, pressure is necessary to insure the necessary time factor. Without pressure, the oil would vaporize and leave the drum through the vapor outlets before cracking could be effected. Behimer's is a liquid phase pressure drum cracking process.

The Burton stills at the plant of the Standard Company of Indiana were not equipped to operate at over 95 pounds pressure. At this comparatively low pressure, it was found very difficult to crack the kerosene in the reflux. Burton type stills expressly designed to operate at 325 pounds pressure successfully crack the kerosene but their use was difficult and dangerous because of carbon formation and high pressure. The commercial device utilizing the Behimer process could not crack the kerosene without the use of the relatively high pressure of 300 to 400 pounds.

A factor which makes for the successful cracking of the kerosene is the use of the bubble tower. It greatly improves fractionation and more perfectly removes the kerosene fraction from the vapors of the product. The distillate from the commercial device of the patent in suit, without a bubble tower and at a pressure of 158 pounds, contained more kerosene than the distillate from the Burton stills operated at 95 pounds, with a bubble tower.

Behimer's process, as originally conceived, was a relatively high pressure, liquid phase process and the oil was maintained at a high level in the drum.

It was not until the advent of the high-compression motor and the consequent demand for antiknock gasoline that the Texas Company departed from the liquid phase and high level of oil in the drum.

In 1921, Behimer resumed experiments to determine whether it was possible to crack successfully in the coil. He outlined this work in a report to the Texas Company and stated that so far, the experiments indicated that it was impossible to obtain appreciable cracking in the coil without carbonizing the tubes. In 1925, he filed an application for patent No. 1,923,526 covering a discovery for the cracking of oil in the coil short of carbon formation. Thus, it will be seen that at the time he conceived the process of the patent in suit and made application therefor he had discovered no way to crack in the coil and avoid carbon.

The Behimer process called for forcing the reflux into the charging stream by mechanical pressure, viz., a hot oil pump. A pump that would handle hot oil successfully was not available when the Behimer process was originally conceived. The original apparatus employed by the Texas Company returned the reflux to the drum and the operation was very successful and profitable.

Behimer did not invent a hot oil pump. It was conceived by N. W. Thompson and is covered by patent No. 1,250,050. After a successful hot oil pump became available, the Texas Company and its licensees in 1921 employed such a pump and returned the reflux under mechanical pressure to the charging stream.

The specification and claims of a patent constitute a contract between the United States and the patentee and they should be read and construed together, not for the purpose of limiting, contracting, or expanding the claims, but for the purpose of ascertaining from the entire agreement the actual intention of the parties.[12]

The scope of every patent is limited to the invention described in the claims read in the light of the specification.[13]

Where the language of a patent is susceptible of a particular construction the Patent Office proceedings may be resorted to to determine whether that construction accords with the avowed intent of the parties to the contract.[14]

[12] Tschappat v. Hinderliter Tool Co., 10 Cir., 98 F.2d 994, 998; Jensen-Salsbery Lab. v. O. M. Franklin B. Serum Co., 10 Cir., 72 F.2d 15, 19.

[13] Motion Picture Patents Co. v. Universal Film Mfg. Co., 243 U.S. 502, 510, 37 S.Ct. 416, 61 L.Ed. 871; Schriber-Schroth Co. v. Cleveland Trust Co., 311 U.S. 211, 217, 61 S.Ct. 235, 85 L.Ed. 132.

[14] Goodyear Dental Vulcanite Co. v. Davis, 102 U.S. 222, 227, 228, 26 L.Ed. 149; Wiegand v. W. Bingham Co., 6 Cir., 106 F.2d 546, 548; Gasoline Products Co. v. Champlin Refg. Co., 10 Cir., 86 F.2d 552, 559; Warren Bros. Co. v. Thompson, 9 Cir., 293 F. 745, 747.

In Goodyear Dental Vulcanite Co. v. Davis, supra, the court said:

"But when a patent bears on its face a particular construction, inasmuch as the specification and claim are in the words of the patentee, it is reasonable to hold that such a construction may be confirmed by what the patentee said when he was making his application."

Each of the claims in suit specifically states that it embraces a process of cracking oil. Only one of the claims in suit expressly refers to a cracking step. Claim 14 states that the oil is maintained in the drum at a cracking temperature. Claim 29 states that the oil is maintained in the drum at a high temperature and under super-atmospheric pressure. But since the claims cover an oil cracking process, cracking must take place somewhere in the process. In the typical claim, 39, it must be referable, we think, to the language "where separation of vapors from residual oil takes place" in the drum. We reach this conclusion because Behimer in his specification states, "It is a broad novel feature of the herein disclosed process that substantially all of the cracking operation occurs in a vessel to which no external heat is applied"; because Behimer in his specification clearly taught, and in the patent proceedings repeatedly stated, that while the oil will be brought to a cracking temperature in the coil, the time element will be so controlled that the cracking temperature will be reached just prior to the exit of the oil from the coil into the drum so that substantially no cracking will occur in the coil and that the cracking step in the process will take place in the drum; and because in the patent proceedings Behimer stated that the vaporization in the drum in his process results from cracking and distinguished prior processes on that ground. Behimer solved the carbon problem by inhibiting cracking in the coil, and effecting the cracking in a drum to which substantially no external heat is applied. Not only is this the interpretation of the process taught in the specification, but it is the interpretation which Behimer placed on the process throughout the Patent Office proceedings on an appeal in Texas Company v. Coe, [15] and in his reports to the Texas Company.

So construed, the alleged infringing process is clearly distinguishable. It cracks in the coil, not in the drum. It is a vapor liquid phase process with a short time factor, [16] whereas Behimer's is a liquid phase high pressure, long time factor process. [16] It introduces the preheated oil at the hottest part of the furnace and brings it to a cracking temperature as quickly as possible, whereas, in Behimer's, the oil is introduced in the coolest part of the furnace and reaches a cracking temperature just before its exit from the heating coil. It releases the pressure at the exit from the furnace and prevents cracking in the drum or vapor separator, whereas, in Behimer's, the same pressure is maintained in the coil and drum and substantially all the cracking takes place after the oil reaches the drum. Behimer's process is designed to handle heavy oil, whereas the alleged infringing process can use only a clean charging stock. In Behimer's, the carbon problem is solved by effecting the cracking in the drum to which no substantial amount of external heat is applied. In the alleged infringing process, the cracking takes place in the coil to which external heat is applied and the carbon problem is solved by methods distinct from Behimer. Behimer's process produces a sweet product, low in unsaturates, like natural gasoline, while the alleged infringing process produces a yellow colored, foul smelling, unsaturated product.

In Jensen-Salsbery Lab. v. O. M. Franklin B. Serum Co., 10 Cir., 72 F.2d 15, 18, 19, we said:

"Every element of a combination or step in a process claimed is conclusively presumed to be material. The omission of one element, ingredient, or step of a combination claim avoids infringement of that claim, whether or not the omitted element, ingredient, or step was essential to the combination. * * *

"A claim of a process patent is not infringed where any one of the steps or series of acts, set forth in the claim as constituting the process, is omitted, unless some equivalent step or act is substituted for the one omitted." [17]

The omission of the step of cracking in the drum and substituting therefor cracking in the coil, which Behimer taught were the antithesis of each other, clearly avoids infringement.

One who disclaims admits that he claimed more than that of which he was the original inventor, and the subject mat-

---

[15] No. 56,230, S. Ct. Dist. of Columbia, decided December 6, 1935.

[16] In the Behimer process the cracking time factor is from 3 to 5 hours.

In the Refining Corporation's process it is from 5 to 6 minutes.

[17] See, also, Haynes Stellite Co. v. Osage Metal Co., 10 Cir., 110 F.2d 11,

ter disclaimed ceased to be a part of his invention. [18]

The claims retained must differentiate in operation and result from the subject matter surrendered. [19]

The clean circulation claims of Behimer to be patentable must be inventively different from the claims surrendered to Dubbs, i. e., the specific details or limitations in the Behimer claims not found in the Dubbs claims must, when combined with the steps embraced in the latter, amount to invention over Dubbs. [20]

Where an applicant for a patent acquiesces in the rejection of claims, and amends the claims or substitutes other claims to meet the objection of the Patent Office, he will be deemed to have surrendered and disclaimed what he thus conceded and is bound by the limitations imposed, and it is immaterial whether the rejection was right or wrong. [21]

Behimer surrendered clean circulation in the interference proceedings.

When Behimer presented claim 42, renumbered 14, it was rejected over the issues of Interference 49,355. Behimer then amended the claim to embrace mechanical pressure or hot oil pump return of condensate. It was the addition of the step of mechanical pressure return that caused its allowance over Dubbs.

Furthermore, clean circulation without a hot oil pump was disclosed by the prior art. Hence, if the claims could be construed as embracing clean circulation with a hot oil pump and as auxiliary to a cracking process, they would stand or fall on the mechanical pressure step of returning reflux.

The use of a pump to force charging stock into the cycle was, of course, well known. Up to the time that the hot oil pump became available the hot reflux in the Behimer process was returned to the drum for further cracking. Being of a lower temperature than the oil in the drum it tended to lower the temperature in the drum. To conceive the idea of returning it to the charging stream by means of the hot oil pump, when such pump became available, so it would pass through the coil and again be raised to a cracking temperature did not rise to the dignity of invention. Rather, it was merely the exercise of the mechanical skill of one trained in the art. [22]

While we do not think the claims in suit can properly be construed as embracing clean circulation with a hot oil pump as an auxiliary to a cracking process, were they so construed, they would be void for want of invention.

The judgment is affirmed.

---

14; Gasoline Products Co. v. Champlin Refg. Co., 10 Cir., 86 F.2d 552, 566.

[18] Maytag Co. v. Hurley Machine Co., 307 U.S. 243, 245, 59 S.Ct. 857, 83 L. Ed. 1264; Altoona Publix Theatres, Inc., v. American Tri-Ergon Corp., 294 U.S. 477, 492, 55 S.Ct. 455, 79 L.Ed. 1005; Union M. C. Co. v. United States C. Co., 112 U.S. 624, 645, 55 S.Ct. 475, 28 L. Ed. 828; Dunbar v. Meyers, 94 U.S. 187, 194, 24 L.Ed. 34. See, also, Greenawalt v. American Smelting & Refining Co., 9 Cir., 10 F.2d 98, 99.

[19] Maytag Co. v. Hurley Machine Co., 307 U.S. 243, 246, 247, 59 S.Ct. 857, 83 L.Ed. 1264.

[20] In re Karplus, 97 F.2d 100, 101, 25 C.C.P.A., Patents, 1192; In re Cole, 82 F.2d 405, 409, 23 C.C.P.A., Patents, 1057; In re Williams, 62 F.2d 86, 88, 20 C.C.P.A., Patents, 738.

[21] Schriber-Schroth Co. v. Cleveland Trust Co., 311 U.S. 211, 220, 221, 61 S. Ct. 235, 85 L.Ed. 132; I. T. S. Rubber Co. v. Essex Rubber Co., 272 U.S. 429, 443, 47 S.Ct. 136, 71 L.Ed. 335; Smith v. Magic City Kennel Club, 282 U.S. 784, 790, 51 S.Ct. 291, 75 L.Ed. 707; Jensen-Salsbery Lab. v. O. M. Franklin B. Serum Co., 10 Cir., 72 F.2d 15, 18; Tschappat v. Hinderliter Tool Co., 10 Cir., 98 F.2d 994, 998; Campbell v. American Shipbuilding Co., 6 Cir., 179 F. 498, 502.

[22] Lincoln Engineering Co. v. Stewart-Warner Co., 303 U.S. 545, 549, 58 S.Ct. 662, 82 L.Ed. 1008; Altoona Publix Theatres, Inc., v. American Tri-Ergon Corp., 294 U.S. 477, 486, 55 S.Ct. 455, 79 L.Ed. 1005.