**TEXAS CO. v. ANDERSON–PRICHARD REFINING CORPORATION.**

**No. 1485.**

District Court, W. D. Oklahoma.

March 7, 1940.

Ames, Cochran, Monnet, Hayes & Ames, of Oklahoma City, Okl. (Newton A. Burgess, of New York City, Brady Cole, of Houston, Tex., Benjamin B. Schneider, of Chicago, Ill., and Drury W. Cooper, of New York City, of counsel), for plaintiff.

Ames, Thiess, Olsen & Mecklenburger, of Chicago, Ill., and Jarman, Brown, Looney & Watts, of Oklahoma City, Okl. (Arthur C. Denison, of Cleveland, Ohio, and J. Bernhard Thiess, Thorley von Holst, Sidney Neuman, and Robert W. Poore, all of Chicago, Ill., of counsel), for defendant.

KENNEDY, District Judge.

This is a patent case involving oil cracking process Patent No. 1,883,850 issued October 18, 1932, to Otto Behimer and assigned to the plaintiff company. The set-up of this law suit portends a battle of the giants in the petroleum refining industry. The record discloses that the principal patents involving oil cracking in the industry are concentrated in two corporations known as the Universal Oil Products Company, which is a subsidiary controlled by the Shell, the Standard of

California, and the Atlantic Refining; and the Gasoline Products Company, which is a subsidiary of the Standard of Indiana and the Texas, and that at the time of the trial agreements were in existence between many of these companies and with other large concerns engaged in the petroleum refining industry which involved indemnifying clauses, waivers, permits, cross-licensing, and the like. On the other hand, the defendant is a member of a group of refining companies comprising the Champlin, the Globe, the Skelly, the Rock Island, the Omar, the Root, and Cities Service, and perhaps some others at one time or another who are or had been users of what is known as the Winkler-Koch Process (the one challenged in this suit), and among themselves they have by assessments on the basis of barrels of gasoline manufactured, contributed to a fund through an organization known as the Winkler-Koch Patent Company for the purpose of defending this process against the charge of infringement throughout different parts of the country and in various courts. The resources of the plaintiff group tied together in the manner heretofore indicated will be recognized as very substantial, and the testimony shows that the group of which the defendant is a member has raised something in excess of $1,000,000 for defense. The significance of the evidence which disclosed the foregoing facts in the case at bar is not fully apparent to the trial court in the solution of any of the issues of the case except perhaps to accentuate the importance of the litigation in the petroleum world, together with a basis upon which the plaintiff presents its argument, that the industry generally has recognized the legitimacy of the patent owned by plaintiff and to which tribute is paid; and the argument on behalf of the defendant that it has a right to refuse tribute to a practical monopoly in the oil cracking industry in the use of what it conceives to be a non-infringing process. So far as this court is concerned in the present action, the wealth and substantial character of the affected litigants do not greatly add to the burden of the court in seeking a solution to the problems presented, except as it may suggest an added responsibility on account of the seeming importance of the matter at hand. On the other hand, no particular worry need be occasioned the court on account of the ever-mounting expense.

Time does not seem to have been an element of importance when it is considered that the files disclose the beginning of the suit in 1933, with issues joined within reasonable time thereafter and except for a slight revamping of pleadings, the case remained dormant for nearly six years when trial was eventually reached through the "kidnapping" of a Judge from another district. It is worthy of mention that the case has been well and thoroughly tried. Five thousand pages of testimony were taken, together with the introduction of hundreds of exhibits requiring a trial period of six weeks. Over a thousand pages of printed trial briefs with appendices and proposed findings were presented, with a concluding oral argument of twenty-five hours, transcribed into a record of 750 pages. Earnest and untiring effort has been put forth to educate the trial court, little acquainted with patent litigation. The burden thereby imposed has not been a light one. To add to this complicated matter it has been developed that there are hundreds of patents covering oil cracking processes and thousands of cases in the books involving this class and kindred kinds of patents, all of which seem to have been cited on the one side or the other in counsels' briefs and arguments. One case of this character in a lifetime ought to be enough to fully satisfy the ambition of the most energetic judicial servant. With this brief outline of the picture confronting the trial court at the time a decision is imminent, an effort will be made in as brief a space as possible to outline the views of the court and at least with a reasonably prompt decision send the case on its way to the appellate courts, believing that its proper ultimate resting place should be in the bosom of the Supreme Court.

Specific reference to pleadings would seem to be unnecessary as the issues have been frankly and fully stated by counsel so as to be concise and little apt to be misunderstood. In simplified form, the issues between the litigants may be stated as follows: The plaintiff claims that the process used by the defendant is an infringement upon the claims of plaintiff's patent. The defendant claims (1) that its process is so different from the plaintiff's as not to infringe; (2) that the plaintiff abandoned or disclaimed certain features of his patent in Patent Office proceedings; and (3) that if defendant's

process is interpreted to read upon the claims of plaintiff's patent that then the patent is anticipated by prior patents and disclosures in the art. There are 44 claims set forth in the Bchimer patent but not all are tendered by plaintiff as an issue in this suit. Those relied upon are claims 14, 19, 21, 22, 23, 25, 29, 35, 36, 38, 39, 40 and 41. It has seemed to be satisfactory to counsel for plaintiff to rely upon two claims as substantially setting forth the nature of the patent for the purposes of comparison with defendant's process in determining the issue of infringement. These are claims 38 and 39 and are quoted from the patent as follows:

"38. A process of converting relatively heavy into lighter hydrocarbons, which comprises charging a stream of oil through a coil in a heating zone where said oil is heated to a cracking temperature, passing the oil to a zone maintained at a cracking temperature where conversion thereof occurs, separating the lighter products from the residual oil by vaporization, introducing generated vapors to a reflux condenser, returning reflux condensate mixed with charging stock under a forced mechanical pressure to said heating coil, preventing the return of residual oil to the heating coil, and maintaining superatmospheric pressure on the oil undergoing conversion in said system.

"39. A process of cracking oil which comprises subjecting oil in a fired heating zone to a cracking temperature solely by the application of external heat, delivering the highly heated oil into a heat insulated zone where separation of vapors from residual oil takes place, discharging the residual oil, subjecting separated vapors to partial condensation to separate out the heavier constituents thereof as a condensate, removing uncondensed vapors and positively returning condensate unmixed with residual oil by maintaining mechanically applied pressure to the heating zone for further treatment and continuously supplying charging stock to the process."

Flow diagrams of both the process of plaintiff and the process of defendant have been introduced as plaintiff's Exhibits Nos. 134 and 135, respectively, with a very definite explanation and interpretation of the nature of the process used by each party. Time will not suffice to give a complete description of the theories upon which the respective counsel base their very divergent views. The matter will be somewhat considered in attempting to discover the outstanding elements of each process with a view to solving the infringement issue.

We learn from the interpretation of the Patent Statutes that in the application for a patent there shall be contained a written description of the device and of the manner and process of making, compounding and using it in such full, clear, concise and exact terms as to enable any person skilled in the art or science to which it pertains, or to which it is most nearly connected, to make, construct, compound and use the same. Incandescent Lamp Patent, 159 U.S. 465, 16 S.Ct. 75, 40 L.Ed. 221. It has been held that the scope of every patent is limited to the invention described in the claims contained in it, read in the light of the specifications. Motion Picture Patents Co. v. Universal Film Manufacturing Co., 243 U.S. 502, 37 S.Ct. 416, 61 L.Ed. 871, L.R.A.1917E, 1187, Ann.Cas. 1918A, 959. Again, we see that the specifications and claims of a patent constitute a contract between the United States and the patentee and that they should be read and construed together, not for the purpose of limiting, contracting or expanding the claims but for the purpose of ascertaining from the entire agreement the actual intention of the parties. Jensen-Salsbery Laboratories v. Franklin Serum Co., 10 Cir., 72 F.2d 15. These cases seem to impose upon the court the duty of examining the specifications for the purpose of clarifying as far as possible the intention of the patentee as to the nature of his device or process upon which he sought favorable action by the Government in giving him a monopoly thereon. No attempt will be made to quote fully from the specifications contained in the patent, but reference will be made to those statements which would seem to explain generally the nature of the process. It is therein stated by the applicant that in prior methods of cracking hydrocarbon oils considerable difficulty has been experienced on account of carbon formations which occur on the sides of tubes and stills exposed to the heat required to carry on the cracking operation. The applicant states that it is a broad and universal feature of his process that substantially all the cracking operation occurs in a vessel to which no external heat is applied except at such times and in such quantities as are necessary to compensate for heat losses, the oil prior to its intro-

duction to such vessel having been subjected to a high degree of cracking heat and the excess heat being used to effect its own decomposition. The applicant again offers as a reason for his form of process, that he thereby avoids substantial carbon formations of the destructive character which proved such an impediment to prior systems, and that the removal of the cracking operation from the heating zone removes the danger from fires where cracking is carried on in highly heated stills and coils exposed to direct heat. He says that the oil to be treated on entering the circuit is subjected to a high degree of heat but the time element is so controlled that there is comparatively little decomposition and deposition of carbon while it is exposed to this external heat, the oil being rapidly removed from the heating zone and conducted to the cracking zone where without being subjected to additional heat it undergoes a molecular decomposition whereby carbon and like products are formed and liberated. He explains that according to his invention the time factor is controlled by regulating the rate of heating the oil passing through the heating zone, that the temperature thereof is progressively raised in transit and reaches the desired cracking temperature near the end of the heating coil at about the time it emerges therefrom, and that the oil leaves the heating coil before any substantial decomposition or deposit of carbon takes place. The bulk of the carbon is then removed from the circuit by withdrawing from the cracking zone portions of the residual oil. The applicant says that the process in its broad conception is completed at this stage of the operation but that the light products preferably continue a cycle leaving the cracking zone in the form of vapor and gas which are subjected to a reduction in temperature resulting in the condensation of the heavier constituents and such condensate is combined with the charging oil entering the heating zone, thereby completing the cycle. The outlets from the circuit are controlled so as to be maintained under a pressure sufficient to ensure the desired molecular transformation. The applicant explains in the specifications at considerable length that instead of circulating the heavy residuum in which quantities of carbon are formed that this is removed so as to keep the circuit free from carbon formation which he is able to do through conducting substantially all the cracking in a vessel to which no external heat is applied, or a small quantity of heat to maintain temperature conditions. In this manner he is able effectively to remove the carbon and eventually by returning the condensate to the heating coil with the fresh feed, the heavier carbon being removed, the condensate is continued through the cycle and ultimately reduced to gasoline. The applicant states that he has devised a novel apparatus adapted to carrying out his process which is illustrated by a drawing made part of the patent. Without elaborating at length upon the illustrated apparatus but describing it in simplified form, it shows four heating coils located in a furnace, the oil being forced into these coils for heating purposes and after such heating to a temperature which reaches the cracking stage near the end of the heating coil it is discharged into a drum or vessel partially filled with oil without being heated or heated to a minor degree to maintain necessary temperature conditions, where the cracking of the oil takes place under a pressure of from 100 to 400 pounds. From the bottom of this drum or vessel the residuum or carbon is withdrawn and as the cracking takes place the balance of the contents of the drum passes over a goose-neck and into a separator. From this separator the lighter vapors pass out through a coil and are condensed for use as the manufactured product and the heavier constituents of the separator contents are returned to the entrance of the coil and blended with the original charge through the instrumentality of what is denominated a jet. This combined stream then passes through the entire apparatus continuously, constituting what may be called the complete cycle.

It is claimed by the defendant with a degree of dispute on the part of the plaintiff, that the records of the Patent Office are available to assist in construing the language of the patent. This theory of the defendant seems to be supported by authority to the effect that the construction of a patent may be confirmed by the avowed understanding of the patentee expressed by him or on his behalf when his application for patent was pending and that when a patent bears upon its face a particular construction inasmuch as the specifications and claims are in the words of the patentee, it should be reasonable to say that such a construction may be confirmed by what the patentee said when he was making his application. Goodyear Dental Vulcanite Co. v. Davis, 102 U.S. 222, 26 L.Ed. 149. It

has been said that file-wrapper history may be searched in difficult cases in avoiding the prior art to discover the precise meaning of the language which represents the contract between the applicant and the Government. Wiegand v. Bingham Co., 6 Cir., 106 F.2d 546. Certiorari denied, 60 S.Ct. 386, 84 L.Ed. ——. This seems to be the rule adopted by the Tenth Circuit. Gasoline Products Co. v. Champlin Refining Co., 10 Cir., 86 F.2d 552. Reliance is had by the defendant upon many of the statements and representations made by the patentee while his patent application was being prosecuted in the Patent Office. It would be impracticable to review at length for the purposes of this memorandum the representations made by the patentee or on his behalf in the Patent Office, but suffice it to say that the applicant in construing his invention repeatedly represented it as one which was intended to prevent any decomposition in the heating coil as far as practicable and effecting substantially all the cracking in a zone separate from the heating zone which is either heat insulated or subjected only to a moderate degree of heat. This the applicant calls a distinctly new and very important invention which distinguishes it from those of the prior art. So much for the description of the patent in issue as contained in the specifications and the interpretation given in the patent proceedings in the light of which the claims heretofore referred to must be read and construed.

It is appropriate at this point to consider briefly and in simplified form the process in use by the defendant which it is alleged infringes the claims of plaintiff's patent. The process used by the defendant is not a patented process so that no opportunity is given to compare specifications or claims with those set out in plaintiff's patent. Resort must be had to the flow diagram illustrating the process used by the defendant, together with the testimony given with respect to its operation. The apparatus as disclosed by the flow diagram consists of a large number of coils located in a heating furnace where various degrees of heat are applied to the oil from incipient heating to final cracking in a series of five variously located sets of coils of small diameter and in length as shown by the testimony extending over a distance of practically a mile, through which the oil must pass before it finds its way out. The furnace is so arranged that the heat be-

comes more intense and cracking begins in the third set of tubes where the external heat is most intense, but the substantial cracking occurs in the fourth and fifth sets of coils where the external heat is less intense, but the heat of the oil itself is greater in bringing about the cracking process. All of the cracking in this apparatus is done in the coils with the exception as shown by the testimony of approximately one percent which may occur in the drum or vapor separator into which the oil is released. In its course through the coils the charge of oil reaches a vapor form in which the major portion of the cracking takes place and a pressure valve is maintained to condense into more compact form these vapors which are eventually released into the drum with only sufficient liquid therein to act as a seal and submitted to a reduced pressure of about thirty pounds. Just before the vaporized discharge from the coil reaches the vapor separator it is augmented by a quench of topped crude. The process through the vapor separator into a bubble tower then follows, with a return of the condensed product in the bubble tower to the coils. The residuum or carbon is removed from the bottom of the separator and eliminated from the circuit. A charge of gas oil through a pump is injected into the bubble tower. The manufactured product consisting of the lower boiling point constituent passes out of the top of the bubble tower into a collecting tank. This is a layman's crude description of the defendant's process, eliminating all reference to the highly technical matters concerning furnace construction, heat units, type of charge used, and the like, but it would seem sufficient to use as a matter of comparison with plaintiff's process which has been outlined heretofore. The chief distinguishing feature between the two processes appears to be, that in plaintiff's process the idea is reflected of heating in the coil without any substantial carbonization and cracking and cracking in a drum where little or no heat is applied; while in defendant's process all the cracking of the oil is performed in the coil and with little or no substantial cracking in the drum. The carbon formation in defendant's process is avoided by rushing the oil through at high speed eventually reaching vaporized form so that no substantial carbonization occurs. In plaintiff's process a liquid is maintained in the drum under high pressure for cracking purposes. In

defendant's process no liquid of substantial amount is maintained in the drum and a comparatively low pressure is maintained. The plaintiff's process would seem to be what is known in the art as a liquid-phase process, while the defendant's partakes of a form known as the vapor-phase. The plaintiff's process with the high pressure in the drum partaking of that form known in the art as pressure distillation. The defendant's process on account of the absence of high pressure would seem to be distinctly different. A fair comparison of the two processes to the ordinary mind would seem to invoke an analysis that the plaintiff through his patent teaches heating in the coil without any substantial cracking and cracking in a drum or vessel without any substantial heating, this method being adopted to eliminate the carbon difficulty theretofore expressed in coil cracking, while the defendant through its process uses not only heating but cracking in the coil to an extent of vaporizing the charge and releasing the contents of the coil together with a fresh charge into a drum where comparatively low pressure is maintained. It seems difficult to reach a conclusion that these two methods of cracking oil are of such similarity that the operation of defendant may be said to read upon the claims of the plaintiff as they have by the patentee been explained in his specifications and expressions in regard to his process given in the patent proceeding. Great stress has been laid upon the language of the patent with reference to a cracking zone as indicating that this was in the contemplation or might be attributed to a reasonable contemplation of the patentee for a cracking zone to be located in the coil. The difficulty we find with this theory is, that it is in direct conflict with the patentee's expressed theory, that no cracking of a substantial nature could occur in a coil on account of the difficulty occasioned by carbon formation. We cannot so construe the language of the patent as that in this respect the so-called cracking zone referred to in his claim is an equivalent of the form of the coil-cracking used by the defendant.

The comparison of the two processes which has been attempted up to the present time has been without particular consideration of the return of the condensate to the coil for further treatment. So far as this particular element is concerned it seems to be substantially the same in both processes. While in plaintiff's process the return is effected through what is called a jet, the means employed by the defendant is a pump. These amount to an equivalency in producing the results desired. The evidence tends to show that in the trials conducted under plaintiff's process the jet proved to be more or less ineffective and eventually a pump was substituted. In the early experiments, however, the industry in pump-making had not yet discovered the means by which the pumps then in existence could efficiently handle hot oil. This instrument was later developed and is now in general use. The contention of the defendant in regard to the use of the so-called cyclic system involving the return of the condensate is, that this element of the patent must be read as a constituent element in plaintiff's coil heating and drum cracking process. Defendant points to the language of the specifications heretofore adverted to, stating in substance that the process is completed at a certain stage of the operation where the bulk of the carbon is removed from the circuit by withdrawal from the cracking zone, yet the light products constituting the condensate may preferably continue the cycle, which language would suggest at least that with the use of plaintiff's process the product might be entirely removed from the system, or the user might return the light condensate if he chose. However this may be, it seems to be clearly apparent that the plaintiff did not devise and can not here contend for a process involving a continuous cycle except it be as a part and parcel of an oil cracking process. So considered, it is inseparably connected and a part of the process of oil cracking which the patent discloses. It follows in logical sequence that if the so-called cycle were used in connection with the process which is entirely different than the process taught by plaintiff's patent, there could be no infringement involving this individual element. The patentee does not describe it as a separate and distinct step which might be employed in the use of any other oil cracking process.

In addition to this contention, however, the defendant relies strongly upon the Patent Office records to sustain its view, that whatever right the plaintiff may have had to an invention involving the cyclic system now generally referred to as "clean circulation," this position of plaintiff was

lost in the interferences which took place in the Patent Office before the patent was issued. Considerable dispute has arisen as to whether there was an abandonment by the patentee of his claim of being the original inventor of the cyclic system, whether he waived his right to this position or whether he disclaimed it as against another patentee. In a practical way perhaps, the matter of terms is not so important as the determination of the question of whether the plaintiff's assignor gave it up and emerged from the Patent Office with a patent which did not contain the idea of clean circulation in its broad sense. Under the theory of the decisions heretofore cited, that resort may be had to proceedings in the Patent Office to interpret the contract between the patentee and the Government, it is found that a great deal was said by the patentee and through the mouth of his counsel upon this phase of his application. It would unduly extend this memorandum to rehearse this type of evidence, but a running sketch of those proceedings is, that a patent involving the so-called clean circulation had been issued to one Dubbs upon an application junior to that of Behimer and that while the Behimer application was still pending. Interferences were proposed and accepted involving the matter of the cyclic system. The method of return up to that time had been through the use of gravity which proved, however, to be both impracticable and expensive, but nevertheless the return system was incorporated in the Dubbs patent. Behimer contested this issuance, claiming to be the inventor of the cyclic system, but in the interferences a compromise was reached by which Behimer was issued a patent involving the return of the condensate through the medium of a pump or "mechanically applied pressure." This phrase is found in all or nearly all of the claims in controversy. The matter in dispute between the litigants is as to whether or not in the Patent Office proceeding the process in the return of the condensate was considered in its broad sense or in a limited sense (technical terms avoided) in connection with other provisions of the Dubbs patent. Defendant contends that it was considered in the broad sense and that Behimer secured it only in connection with the method of returning the condensate by a pump or mechanically applied pressure, while Dubbs retained his cyclic system with a method of returning through gravity or any method distinguished from a machine through which pressure was applied. Plaintiff contends that the distinguishing feature was in another part of the Dubbs process involving cracking with no substantial vaporization in the coil. I think that the proceedings in the Patent Office when taken by and large indicate that the matter in dispute was the consideration of the cyclic system in its broad sense and that Behimer disclaimed to Dubbs any claim which he might have made upon the ground of being the discoverer of the cyclic system and accepted in lieu thereof the element of its use through a pump or mechanically applied pressure.

This situation so analyzed still leaves the plaintiff with a patent covering the return of condensate by the use of mechanically applied pressure which the defendant admittedly uses. The question arises as to whether or not in the sense that it is now considered, the defendant's process is an infringement on the claims of plaintiff's patent. The point is made that in itself and considered alone, a pump used for the purpose of injecting the condensate into the stream of the original charge or returning it to the coil is not patentable. The pump was used from time immemorial for the purpose of raising liquid from a lower to a higher level and for bringing liquid from a level of lower pressure to a higher pressure. In this view, its use in the return of condensate therefore would be what a person of ordinary mechanical skill would think of and for this reason a step involving its use for the purpose here needed could not be considered in any sense as novel. The difficulty at the time was not that a person interested in the matter would fail to think of a pump but in the fact that no pump had been devised which would withstand the rigors of handling oil heated to a super-degree of temperature. The one who discovered or invented such an instrument would undoubtedly have something novel and patenable, but Behimer was not the inventor of a hot-oil pump nor does he claim to be. In this view of the situation, therefore, a jet, a surge-pump or any other type of pump or any mechanically applied pressure would not under the circumstances be a novel invention in itself. Its use in connection with the cyclic system would add nothing as a patentable invention to the patent claims of the plaintiff over those

354

which have already been issued in a patent to Dubbs and as a consequence no use could be made of it to the end of making defendant's process read upon the claims of plaintiff's patent.

The conclusion has been reached that the process used by the defendant is a different process than that described in plaintiff's patent; that plaintiff's cyclic system is definitely tied with plaintiff's particular method of oil cracking and cannot be accepted as a feature separate and distinct from the process of oil cracking described in the patent; that the plaintiff in the Patent Office disclaimed or gave up his contended right as the discoverer of the cyclic system for the purpose of effecting a compromise with another patentee and emerged from the Patent Office with a patented cyclic system limited to a return through the medium of mechanically applied pressure; and that this step of mechanically applied pressure in itself is not patentable as involving a novel discovery which would aid him in protecting his cyclic system against use by the public.

The remaining point is, the contention of defendant that in the event the plaintiff's patent and claims be interpreted and construed in accordance with plaintiff's theory, that then plaintiff's invented process is anticipated by the prior art. It would unduly extend this memorandum to discuss this last point at length. Suffice it to say that the court feels that a fair construction of plaintiff's patent in the sense that the plaintiff here seeks to have it construed would bring it in conflict with some of the prior patents like Pielsticker, Hall and Ellis, but as interpreted and construed as a coil-heating, drum-cracking process, with a return of condensate by applied mechanical pressure, it is a valid patent, but not infringed by defendant's process.

Findings of fact and conclusions of law may be formulated by defendant's counsel in collaboration with counsel for plaintiff in general conformity with the views expressed in this memorandum, but carrying out in as much detail as may be pertinent such findings and conclusions as are appropriately within the scope of the court's conclusions, to which findings and conclusions such exceptions may be reserved as desired by plaintiff, and which together with an appropriate judgment, shall be submitted to the court at Cheyenne, Wyoming, on or before the 19th day of March, 1940.